**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00671 (BAH)** |
| **v.** | : | |
| | : | |
| **JAMES DOUGLAS LOLLIS, JR.,** | : | |
| | : | |
| **Defendant.** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence James Douglas Lollis, Jr. ("Lollis") to three months of home detention, thirty-six months of probation, 100 hours of community service, and $500 in restitution.

**I.      Introduction**

The defendant, James Lollis, a 47-year-old man from Greer, South Carolina, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than one million dollars' of property damage.

Lollis pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in the Capitol Building. As explained herein, a sentence of three months' home detention is appropriate in this case because Lollis: (1) entered the Capitol Building with a large group of rioters through the Senate Wing Door, where two adjacent windows had been broken and rioters were climbing through, presumably making him aware of the potential for

1

violence and property destruction; (2) asked a police officer who was attempting to maintain order at the Capitol on January 6 whether he was on the "same team," suggesting that he should not try to stop them, then taunted the officer when he did not respond; and (3) did not disperse after leaving the Capitol Building, but rather joined other rioters who had amassed at the Lower West Terrace entrance to the Capitol Building, where some of the most violent attacks on police occurred that day.  Even if Lollis himself did not participate in any violence or destruction of property, he was certainly aware of the mob's riotous behavior and, despite witnessing these acts, followed the rioters into the Capitol Building.

The Court must also consider that Lollis' conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed.  Here, Lollis' alliance with a mob that rioted and actually succeeded in halting the Congressional certification combined with Lollis' comments towards law enforcement officers and his persistence in remaining in the restricted area show that a strictly probationary sentence is not warranted here, but rather a sentence of home detention is both necessary and appropriate in this case.

## II.     Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 19 (Statement of Offense), at 1-7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to Lollis' conduct and behavior on January 6.

*Lollis' Role in the January 6, 2021 Attack on the Capitol*

On January 5, 2021, Lollis travelled from his home in South Carolina to Washington, D.C., along with Derek Gunby, who was also charged for his conduct on January 6th.[1]   Lollis and Gunby checked into a hotel in Virginia just outside of Washington, D.C.  Lollis later admitted to FBI agents that he brought a handgun with him at that time, but never brought it into Washington, D.C.  He claimed he left the gun in his hotel room when he and Gunby attended the rally for then-President Trump on January 6, 2021, and the government has no evidence to the contrary.  About 10 to 15 minutes before the end of the President's speech, Lollis left the rally and marched with a large group towards the U.S. Capitol Building.

As Lollis got close to the Capitol Building, he approached a Metropolitan Police Department ("MPD") officer positioned outside the Capitol Building and said, "Y'all on the same team we are, aren't you?"  When the officer didn't respond, Lollis further harassed the officer, saying, "You're not going to respond?  You're not on the same team?"  This conversation was captured on video recorded by the officer's body-worn camera, and has been submitted to the Court as Exhibit A.

At approximately 3:22 p.m., Lollis entered the Capitol Building with a large group of rioters through the Senate Wing Door.  As he walked in, he placed a sticker on the wall.  Lollis admitted to the government and to the Court during his plea hearing that the sticker said "FUCK ANTIFA."  He later informed the government that he did not bring the sticker with him to the Capitol, but rather it was handed to him as he was walking into the building.  At the time Lollis entered the Capitol Building, as shown in the photo below, the two windows adjacent to the Senate

---

[1] Gunby has entered a plea of not guilty and his case is still pending before the Court.  *See United States v. Gunby*, Crim. No. 21-626 (PLF).

Wing Door had been broken open.  One of the windows had been re-secured by law enforcement officers and barricaded with furniture to prevent more rioters from climbing through.  Lollis is circled in red.  The closed-circuit video showing Lollis' entrance and exit through the Senate Wing Door has been submitted to the Court as Exhibit B.



        Also at this time, as seen in the above photo, the lobby inside the Senate Wing Doors was packed with rioters.  There were at least a dozen U.S. Capitol Police officers, some in riot gear, attempting to contain the mob.  Lollis walked through the lobby inside the Senate Wing Doors, walked about halfway down the hall to the right of the Senate Wing Doors, turned around, and exited out through the Senate Wing Doors at approximately 3:27 p.m.  The photo below shows Lollis heading toward the exit.



At approximately 3:29 p.m., just two minutes after exiting the Capitol Building, Lollis approached MPD officers at the Lower West Terrace. A crowd of rioters had amassed there, and the officers were positioned there to prevent the rioters from entering the Capitol Building. Lollis approached the MPD officers clearly agitated. He yelled at the officers, "We got a man down here dying! His lips are purple! You need to get him now!" As he moved closer to the officer, he was sprayed in the face with a crowd control spray. Thereafter, Lollis retreated into the crowd. Shortly thereafter, an officer told the rioters, "Bring him up," directing the rioters to bring forward the individual who needed medical attention. Several of the rioters dragged the body of another rioter who appeared to be unconscious and required medical attention. Body-worn camera video from the Lower West Terrace has been submitted to the Court as Exhibit C.

Lollis and Gunby left the Capitol area together. While on the Metro headed back to their hotel, Gunby recorded a video of himself and Lollis. During the video, Gunby stated, in part:

> So, I went with James here, James Lollis, and we met up with some
> people from Texas, . . .  So, yeah we went, we were in front of the
> White House earlier this morning, and then going into the afternoon,
> everyone headed down to the National Mall towards the Capitol.
> And we all pretty much surrounded the Capitol.  We are at a point
> now in this country where they're going to listen to us.  They have
> to listen to us.  Your congressional leaders are not afraid of you.

During the video, when Gunby says "James Lollis," he turned the camera towards Lollis, who was seated directly across from him on the metro.  Gunby then turned the camera back on himself and stated:

> The American patriot in this country has been, we've been saints.
> Saints.   Because the capability of America, and Americans,
> especially if we were the kind of people that the media always
> portrays us to be, we can take this country back pretty quickly.  We
> didn't bring weapons.

Right after Gunby stated, "We didn't bring weapons," a voice from someone who is off-camera said, "We should."  Lollis informed the government that he does not recall being the person stating, "We should."  The government does not have any additional evidence that suggests it was Lollis advocating the use of weapons.  Gunby's Facebook video has been provided to the Court as Exhibit D.

*James Lollis' Interview*

On August 10, 2021, agents from the FBI conducted an interview of Lollis.  Lollis was cooperative and admitted to entering the Capitol Building.  He also told the agents that he brought a handgun with him to the hotel in Virginia, but did not bring it to the rally or to the Capitol on January 6th.

*The Charges and Plea Agreement*

On September 3, 2021, Lollis was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and 40 U.S.C. §§ 5104(e)(2).  On September 8, 2021, he was arrested at his home

in Greer, South Carolina, and released the same day.  On November 16, 2021, pursuant to a plea agreement, Lollis pleaded guilty to a one-count Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in the Capitol Building.  In the plea agreement, Lollis agreed to pay $500 in restitution to the Department of the Treasury.

### III.    Statutory Penalties

Lollis now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G).  As noted by the plea agreement and the U.S. Probation Office, Lollis faces up to six months of imprisonment and a fine of up to $5,000.  Lollis must also pay restitution under the terms of his plea agreement.  *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).  As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of home detention followed by probation.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history.  It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, this Court should bear in mind that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances.  As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air.  No rioter was a mere tourist that day.

Additionally, while evaluating Lollis' individual conduct, the Court should assess that conduct on a spectrum.  This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition.  While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had Lollis personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on Lollis' part is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish Lollis from most other misdemeanor defendants. Lollis' lack of violence and property destruction explains why he was charged only with, and permitted to plead to, a misdemeanor rather than a felony.

Lollis traveled nearly 500 miles to be at the Capitol on January 6th. When he got there, he taunted officers positioned outside who were attempting to maintain control, and sought to recruit them to his cause. Lollis entered through the Senate Wing Door with a large group of rioters, some who had previously breached the door and broken the windows adjacent to the door to gain entry. Once inside, he defaced the Capitol Building by affixing a "FUCK ANTIFA" sticker to the inside wall. When he exited the Capitol Building, despite witnessing firsthand the chaos inside, he remained in the restricted area and gathered with other rioters at the entrance to the Lower West Terrace, a site of considerable violence on January 6.

Accordingly, the nature and the circumstances of this offense establish the need for at least a sentence of home detention.

### B. Lollis' History and Characteristics

Lollis has no prior criminal history. Additionally, he has been compliant with the conditions of pre-trial release and was cooperative with the FBI when they sought to interview him. As set forth in the PSR, Lollis has some mental concerns, for which he receives treatment. *See* PSR ¶¶ 50-53. Additionally, he has primary custody of his two children, ages 16 and 12. *See* PSR ¶ 42.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law.  "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[2]  As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.  *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation.  I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of a sentence of incarceration.  Indeed, general deterrence may be the most compelling reason to impose such a sentence. The violence at the Capitol on January 6 was cultivated by some of the rioters to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly

---

[2] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70.  Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence.  This was not a protest.  *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss).  And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences.  There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Lollis' conduct on January 6, entering the Capitol Building through the Senate Wing Door, harassing a police officer, and remaining in the restricted area even after leaving the Capitol Building clearly demonstrates the need for specific deterrence for this defendant.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, hundreds of individuals have been charged for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this

case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[3] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind.  Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment.  The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not become the default.[4]  *See United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth at sentencing).

The government and the sentencing courts have made meaningful distinctions between offenders.  Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

---

[3]  Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[4]  Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF).  The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

Lollis has pleaded guilty to the one-count Information, charging him with parading, demonstrating, or picketing in a Capitol Building, a violation of 40 U.S.C. § 5104(e)(2)(G).  This offense is a Class B misdemeanor.  18 U.S.C. § 3559.  Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A.  § 3553(6), do apply, however.

For one thing, although all the other defendants discussed herein participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long he remained inside, the nature of statements made (on social media or otherwise), whether he destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences.   And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement.  *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007).  The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful

transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court imposed a similar sentence of 90 days of home detention on Leonard Gruppo, who entered through the Senate Wing Door and remained inside for about 6 minutes. *See United States v. Gruppo*, 1:21-CR-00391 (BAH). Similarly, Eric Torrens, who entered the Capitol Building for about 10 minutes, was also sentenced to 90 days of home detention. *See United States v. Torrens*, 1:21-CR-00204 (BAH).

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

14

**V.      Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors.  As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence.  Balancing these factors, the government recommends that this Court sentence James Lollis to three months of home detention, 36 months of probation, 100 hours of community service, and $500 in restitution.  Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his early acceptance of responsibility.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:

CHRISTOPHER D. AMORE
Assistant U.S. Attorney
Capitol Riots Detailee
NY Bar No. 5032883
U.S. Attorney's Office
555 4th Street, N.W.
Washington, D.C.  20530
Christopher.Amore@usdoj.gov